T.C. Memo. 1995-570


UNITED STATES TAX COURT


WALTER VAN ECK AND FRIEDGARD VAN ECK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8666-92.          Filed November 29, 1995.


     R determined deficiencies in income tax based in
part upon:  (1) a bank deposit analysis for the years
1982 through 1987, and (2) the disallowance of a
deduction claimed in 1987.  Respondent also determined
additions to tax under sec. 6651, I.R.C., for failure
to file, and sec. 6653(a), I.R.C., for negligence.
     1.  <u>Held</u>:  Ps have in part carried and in part failed
to carry their burden of proving that the income items
in dispute were not gross income to them.
     2.  <u>Held</u>, <u>further</u>, R's determination of additions
to tax under sec. 6651, I.R.C., are sustained.
     3.  <u>Held</u>, <u>further</u>, R's determination of additions
to tax under sec. 6653(a), I.R.C., are sustained.


Walter Van Eck and Friedgard Van Eck, pro sese.

<u>Catherine J. Caballero</u> and <u>Jeffery M. Wong</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By one statutory notice of deficiency dated January 27, 1992, respondent determined deficiencies and additions to tax against petitioner Walter J. Van Eck as follows:

|  |  |  | Additions to Tax | |
|  |  |  | Sec. | Sec. |
|  |  | Sec. | 6653(a)(1) | 6653(a)(2) |
| Year | Deficiency | 6651(a) | or (a)(1)(A) | or (a)(1)(B) |
| 1982 | $105,573 | $26,393 | $5,279 | 50% of interest due on $105,573 |
| 1983 | 94,619 | 23,655 | 4,731 | 50% of interest due on $94,619 |
| 1984 | 83,407 | 20,852 | 4,170 | 50% of interest due on $83,407 |
| 1985 | 127,780 | 31,945 | 6,389 | 50% of interest due on $127,780 |
| 1986 | 284,216 | 71,054 | 14,211 | 50% of interest due on $284,216 |

By a second statutory notice of deficiency dated January 27, 1992, respondent determined deficiencies and additions to tax against petitioners Walter J. and Friedgard V. Van Eck as follows:

|  |  | Additions to Tax | | |
|  |  | Sec. 6653(a)(1)(A) | Sec. | Sec. |
| Year | Deficiency | or (a)(1) | 6653(a)(1)(B) | 6661 |
| 1987 | $55,593 | $2,780 | 50% of interest due on $55,593 | --- |
| 1988 | 69,017 | 3,106 | --- | $15,529 |

In her notices of deficiency, respondent explained the adjustments giving rise to her determinations of deficiency. Principally, those adjustments were based upon:  (1) Amounts realized from the disposition of real property, (2) a bank

deposit analysis for the years 1982 through 1987, and (3) the disallowance of a deduction claimed in 1987. Petitioners filed a single petition in response to both notices of deficiency. Prior to and during the trial of this case, the parties entered into a series of stipulations that resolved all adjustments associated with the disposition of real property and substantially reduced the amounts of bank deposits that are in dispute. On brief, respondent has conceded that certain additional deposits represent nontaxable items to petitioners and that the addition to tax under section 6661 no longer is applicable. We accept such concessions. Several items relating to respondent's bank deposit analysis and the disallowed deduction remain for decision, as do the additions to tax under sections 6651 and 6653.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Our findings of fact and opinion for each issue are set out separately.

PRELIMINARY FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact filed by the parties and attached exhibits are incorporated herein by this reference.

## Residence and Return Filings

Petitioners were residents of Wilsonville, Oregon, at the time the petition in this case was filed. Petitioner Walter J. Van Eck (Walter) did not file income tax returns for the tax (calendar) years 1982 through 1986. Petitioners timely filed joint income tax returns for the tax (calendar) years 1987 and 1988.

## Individuals and Entities

Walter and petitioner Friedgard Van Eck (Friedgard) were married in 1986. Previously, from 1973 to 1984, Walter was married to Christine Kosydar (Kosydar). Walter's marriage to Kosydar ended in divorce.

Gertrude (Gertrude) and William (William) Van Eck are Walter's parents. Gertrude's maiden name was Gertrude Vermande. At all times here relevant, Gertrude and William maintained a legal residence in East Haven, Connecticut. Jan Van Eck (Jan) is Walter's brother. Renate Hodges (Hodges) is Friedgard's mother. V. Keith Martin (Martin) was a personal friend of Walter's during the years at issue.

## Walter's Education and Employment

Walter received a Bachelor of Arts degree from Reed College, Portland, Oregon, in 1971. Walter received a Juris Doctor from Willamette University, College of Law, Salem, Oregon, in 1991. As of the trial of this case, Walter had not been admitted to practice law. During the years at issue, Walter performed

management services with respect to residential real estate properties in Oregon that were owned by Walter, owned jointly by Walter and Kosydar, or owned by other persons.  Walter had other employment during some of the years in issue.

OPINION

Introduction

The issues remaining for decision concern items of gross income (mainly evidenced by bank deposits) that respondent claims either Walter or Walter and Friedgard failed to report, a deduction for 1987 claimed by Walter and Friedgard, and the additions to tax for negligence determined by respondent.  Before addressing those issues, however, there are a few preliminary matters that we will address.

Findings of Fact

The issues remaining for decision present us with numerous questions of fact.  With respect to those questions, petitioners bear the burden of proof, which they must carry by a preponderance of the evidence.  Rule 142(a).

As stated, we have found those facts that the parties have stipulated.  Also, we have received into evidence those exhibits attached to the stipulation of facts, as well as other exhibits offered by the parties at trial.  The trial in this case lasted 4 days, and the resulting transcript is 809 pages long.  There are approximately 200 exhibits.  At the close of the trial, we directed the parties to file briefs.  We advised petitioners to

follow our Rules carefully as to the form and content of their briefs. Rule 151 concerns itself with briefs. Paragraph (e) of that Rule addresses the form and content of briefs, and directs that all briefs shall contain certain information. Subparagraph (3) of paragraph (e) directs that all briefs shall contain the following:

> Proposed findings of fact (in the opening brief or briefs), based on the evidence, in the form of numbered statements, each of which shall be complete and shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law. In each such numbered statement, there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement. In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

Petitioners have filed both an opening brief and an answering brief, as has respondent. Petitioners' opening brief fails to comply with Rule 151. In particular, it fails to comply with paragraph (e)(3) thereof. Following the heading "Petitioners' Proposed Findings of Fact" are 61 unnumbered pages, containing petitioners' proposed findings of fact. In support of their proposed findings of fact, petitioners fail to provide any references to either the trial transcript, exhibits, or stipulated facts. In her answering brief, respondent objects to many of petitioners' proposed findings of fact as not being supported by evidence in the record. Because petitioners have

made it virtually impossible for the Court to verify any of their proposed findings that were objected to by respondent, and because they have violated Rule 151(e)(3), the Court, in making its findings, has disregarded all of petitioners' proposed findings to which respondent has objected.

Respondent's briefs comply with Rule 151. In respondent's opening brief, respondent makes proposed findings of fact. In petitioners' answering brief, petitioners object to many of respondent's proposed findings of fact and provide alternatives thereto. The section of petitioners' answering brief entitled "Petitioners' Response to Respondent's Proposed Findings of Fact" is 64 pages long and contains both objections and alternatives. That section contains no citations to the record, either in support of objections or in support of alternatives. Following that section of petitioners' answering brief is a section entitled "Argument", the first subsection of which is entitled "The Proposed Findings of Fact". That subsection purports to deal with both respondent's proposed findings of fact and petitioners' "alternate" proposed findings of fact. That subsection is 751 pages long. It in no way complies with the instruction of Rule 151(e)(3) that proposed findings of fact "shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law." While the subsection does make reference to the record, in some cases those references are incomplete

(e.g., "Tr. __, lines__."). For the most part, the subsection contains a mish-mash of facts and arguments that we cannot separate. In making our findings of fact, we have considered those portions of the subsection that address respondent's proposed findings of fact and that set forth specific objections. We have not considered those portions of the subsection that set forth alternative proposed findings of fact. We have not done so for the following reasons: Those portions do not comply with the requirements of Rule 151(e)(3) for proposed findings. Respondent has had no opportunity to respond to those proposals. Petitioners cannot escape their initial failure to make acceptable proposed findings simply by proposing alternatives to respondent's findings. We extended petitioners' time to file their answering brief at least three times. It would be unfair to visit on respondent the additional delay involved in requiring a response.

In arriving at our findings of fact, we have taken into account those facts that have been stipulated, and have accepted certain facts proposed by respondent. We have examined both the exhibits in evidence and the transcript of the trial, and we have found certain facts based on those examinations.

Burden of Proof

Also, before proceeding, we wish to comment on what appears to be petitioners' misunderstanding of the burden of proof. In their briefs, petitioners repeatedly state or imply that it is

respondent's responsibility to show that petitioners received an item of income, were not entitled to a deduction, or are subject to the additions to tax.  That, of course, is not so.  See Rule 142(a).  Walter has had legal training.  He was advised by the Court to pay close attention to our Rules.  At various times, both the Court and respondent's counsel have tried to give petitioners, who represent themselves, help in understanding and complying with the procedures and formalities for preparing, trying, and briefing their case.  We cannot, and will not, however, excuse or overlook petitioners' failure to abide by our Rules or to understand some of the basic and fundamental aspects of bringing a case in the Tax Court.  Petitioners' apparent failure to understand their obligation to prove their case imposes risks that they must bear.

Income Items in Dispute

The parties have stipulated to, or conceded at trial or on brief, numerous issues that relate to respondent's bank deposit analysis.  The parties have stipulated to the amounts that are in dispute under respondent's bank deposit analysis.  They have prepared an exhibit (Exhibit 201-GK) setting forth those amounts and certain other amounts that were not deposited in any bank account but that are in dispute between the parties.  We have reproduced Exhibit 201-GK as an appendix.  We accept that the items on Exhibit 201-GK are the remaining items of income that are in dispute and that we must determine.  We have grouped those

items into eight categories: (1) 1982 Rental and Contract Deposits, (2) 1984, 1986, and 1987 Rental Deposits, (3) GVE Loans, (4) Triad Distribution, (5) WFVE Gifts and Loans, (6) Reprographics Plastics Deposits, (7) Unknown Source Deposits, and (8) Nondeposited Amounts. We will treat each of those categories and the parties' respective arguments in turn. As necessary, we shall make findings of fact relative to each category.

1.  1982 Rental and Contract Payments

On Exhibit 201-GK, under the heading "Rental Income", for 1982, in a row labeled "Total Rent Income", is the amount: $38,546.71. Under the headings "Interest Earned On The--16074 Contract" and "Interest Earned On The--19556 Contract: Payment Book #36" are the amounts: $9,384.79 and $8,704.20, respectively. Walter concedes that one-half of each of those three amounts is gross income to him. Respondent concedes that the remaining halves are not gross income to him. Respondent also concedes that the total "Interest Earned" amount ($18,088.99 = $9,384.79 + 8,704.20) reduces the amount shown for 1982 in the row labeled "Unknown". We accept those concessions and find accordingly.

2.  1984, 1986, and 1987 Rental Deposits

On Exhibit 201-GK, under the heading "Rental Income", in a row labeled "Total Rent Income", are the amounts $5,352, $3,206, and $15,622.02, for 1984, 1986, and 1987, respectively. On

brief, respondent states:  "These rents were generated from properties belonging to either William or Gertrude Van Eck [William's parents], Renate Hodges [Friedgard's mother] or Keith Martin [Walter's friend]."  Apparently, ownership of some or all of such properties changed hands from Walter after 1982.  We accept as true respondent's statement as to post-1982 ownership by others than Walter, and we find accordingly.  Walter argues that the income from such properties should be taxed to those others, the post-1982 owners of the properties.  Respondent argues as follows:

> Respondent admits that the rents from these properties initially constituted gross income to petitioners' parents, rather than petitioners.  It bears restating, however, that **Walter Van Eck never transferred a dollar of the net rents to petitioners' parents or Keith Martin during any of the tax years at issue.**  * * *  Portions of the rents collected, after being commingled with funds from other sources, were spent upon mortgage and other expenses associated with the properties.  * * *  The balance of the rents were spent by petitioners for their own personal purposes, together with the other funds they deposited as "loans," "gifts," or funds belonging to other family members.  * * *

Respondent has failed to explain how income that was income to others became income to Walter or Walter and Friedgard. Apparently, respondent is frustrated with the difficulties that her agents and attorneys encountered during the examination and trial preparation phases of this case:

> Respondent submits that the record morass created by Walter Van Eck is so deliberately confounded, and his credibility is so negligible, that we must reduce

the issue of gross income to its most fundamental
components:  who owned the funds, and in what form were
they received.  The question of fund ownership must be
reduced to its most critical component: **who received
the benefit of the funds**.  The second question
regarding form of receipt begs the critical issue in
this case:  did Walter Van Eck receive hundreds of
thousands of dollars in loans and gifts from family
members during the tax years at issue, or is he engaged
in some income producing activity which he and his
relatives are concealing from respondent?

Respondent's frustration, however, and the suspicions born of it,
are no substitute for evidence.  Respondent admits that the
properties in question, at least during 1984, 1986, and 1987, did
not belong to Walter (or Walter and Friedgard), and that the
rents from those properties did not "initially" constitute gross
income to Walter or Walter and Friedgard.  Without more, such
admissions are consistent only with the conclusion that the rents
in question are not gross income to either Walter or Walter and
Friedgard.  Respondent bears the burden of going forward with the
evidence to show that, either by theft or honest labor, the rents
in question became items of gross income of Walter or Walter and
Friedgard.  Despite all her huffing and puffing, that is
something respondent has failed to do.  Respondent has failed to
carry her burden of going forward with the evidence to prove that
the rents, initially the income of others, became items of gross
income of either Walter or Walter and Friedgard.  For that
reason, we find that the rents in question were not items of
gross income to either Walter or Walter and Friedgard.  We hold

accordingly, and we do not sustain respondent's deficiencies to that extent.

   3.  GVE Loans

### FINDINGS OF FACT

From 1982 through at least the beginning of June 1987, Walter maintained a checking account in Connecticut, in his own name, at Connecticut National Bank, account number 245-7044 (Conn. account 7044). From June 1983 through April 1985, Walter maintained a checking account in Oregon, in his own name, at U.S. Bank, account number 155-0502-221 (USB account 2221). The amounts shown on Exhibit 201-GK in the row labeled "GVE Loans" reflect certain deposits to Conn. account 7044 and USB account 2221 of funds received from Gertrude, Walter's mother. The amounts remaining in dispute as GVE Loans are as follows[1]:

| Year | Amount |
|------|--------|
| 1982 | $32,564.84 |
| 1983 | 23,741.95 |
| 1984 | 48,008.70 |
| 1985 | 49,389.93 |
| 1986 | 39,872.48 |
| 1987 | 20,615.80 |

Those amounts were deposited to Conn. account 7044 and USB account 2221 during the years indicated. All of those amounts

---

[1] Except with regard to 1987, our findings agree with the entries for 1982 through 1987 in the row labeled "GVE Loans" on Exhibit 201-GK. The discrepancies arise from respondent's proposed finding 434d., which leads to the lesser amount found. We accept that difference as a concession by respondent.

were deposited to Conn. account 7044 except for $2,500 and $500 deposited to USB account 2221 in 1983 and 1984, respectively. Of those amounts, the following amounts constitute fees for management services rendered by Walter:

| Year | Amount |
|------|--------|
| 1982 | $2,072 |
| 1983 | 757 |
| 1984 | 1,527 |
| 1986 | 303 |
| 1987 | 1,887 |

OPINION

The label "GVE Loans" stands for Gertrude Van Eck loans, which, respondent argues, is a misnomer. Respondent discusses the GVE Loans as follows:

Walter Van Eck never provided the Court with a summary of all of the loans he allegedly obtained from Gertrude Van Eck during the tax years at issue. Respondent has never undertaken the Herculean task of determining the alleged loan amounts from Walter Van Eck's records.

The heading [GVE Loans], instead, largely refers to the number of deposits which were made into Walter Van Eck's Connecticut account, Conn-7044. * * * Respondent initially understood that the Conn-7044 account was exclusively used as a loan account between Gertrude and Walter Van Eck. Respondent accordingly deemed all of the deposits into Conn-7044 to be alleged loans.

Respondent subsequently discovered that the Conn-7044 account was also used for a variety of other purposes. It was used to transmit funds allegedly originating from William Van Eck to Walter Van Eck. It was also used as a vehicle for transferring funds from Connecticut to the Oregon bank accounts to satisfy expenses arising from the rental properties belonging to William and Gertrude Van Eck. * * *

Walter testified that, from 1982 through mid-1987, he received loans from Gertrude, his mother. He testified that Gertrude would deposit loan funds into Conn-7044. Gertrude did not testify. The parties, however, have stipulated as to how Gertrude would have testified had she been called. The parties have stipulated that, in part, she would have testified as follows:

> During the tax years at issue, and through the 1993 year, she made loans to Walter and Friedgard Van Eck in such amounts and under such circumstances, as were reflected in Walter Van Eck's testimony on these matters. Gertrude Van Eck's testimony would have been entirely consistent with Walter Van Eck's testimony on the issue of the loans;

Respondent attempts to impeach the testimony of Walter and Gertrude by questioning the financial ability of Gertrude and William, Walter's father, to make loans to Walter in the amounts claimed by him. For example, respondent points out that, in 1993, William and Gertrude made an offer in compromise of their Federal income tax liabilities for 1986 and 1988 through 1990. Such liabilities totaled approximately $45,000, and William and Gertrude offered $10,000. In support of their offer in compromise, William and Gertrude claimed a negative net asset value. The parties differ as to whether Gertrude told respondent's agent that she made no loans to Walter during 1986 and 1987 except for a few small transfers of under $1,000 or whether she gave the agent a schedule reflecting no loans after mid-1984. Respondent also attempts to impeach the testimony of

Walter by attacking his veracity. In evidence is an affidavit of Walter's made in connection with his divorce from Kosydar. Joint Exhibit 136-EF. That affidavit is dated July 17, 1987. In that affidavit, Walter declares, among other things: (1) "The number and amount of loans * * * from my parents has steadily decreased, and has reached the point of zero" and (2) "My parents' financial condition has deteriorated sharply in the last years, and they are virtually insolvent, with no cash assets of any kind available."

The parties have stipulated that, if Gertrude were to testify, she would testify that, during 1991 and other years, she borrowed money from third parties and, thereby, was able to make loans to Walter.

There is no question but that the amounts shown on Exhibit 201-GK as GVE Loans (the GVE Loans) represent deposits to bank accounts of Walter's. We have said: "A bank deposit is prima facie evidence of income and respondent need not prove a likely source of that income." Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Here, however, we know the source of the deposits, at least in the sense of knowing from whom they came, Walter's mother. Given the conclusions naturally to be drawn from a transfer of funds from a parent to a child, respondent does not rest on the fact of the deposits as establishing income. Respondent posits the necessary further inquiry as to the GVE Loans and other amounts received from family members as follows:

did Walter Van Eck receive hundreds of thousands of dollars in loans and gifts from family members during the tax years at issue, or is he engaged in some income producing activity which he and his relatives are concealing from respondent?

Respondent speculates as to that income producing activity:

The Van Eck family, as one integrated unit, could be selling anything from molded plastic products [a business of Walter's brother Jan, whose business ventures respondent describes as "generally not successful"] to prescription medication [Walter's parents were both physicians].  * * *  Walter Van Eck could be selling anything from tax and financial management services to money laundering systems developed on his computers.  * * *

Specifically, respondent argues that portions of the GVE Loans (and certain other amounts from either Gertrude or William) should be deemed compensation from Gertrude or William for property management services.  Indeed, Walter testified that, although he did not have specific recall, withdrawing funds from Conn. account 7044 for fees due for management services would be the way such fees would be paid by his mother.  Respondent has computed management fees due Walter from his parents and Keith Martin to be at least:

| Year | Amount |
|------|--------|
| 1982 | $2,072 |
| 1983 | 757 |
| 1984 | 1,527 |
| 1986 | 303 |
| 1987 | 1,887 |

Respondent also argues that other portions of the disputed deposits may be deemed fees paid to Walter for tax management and

tax shelter services rendered to his parents.  Respondent suggests no amounts for such services.

Suspicions are not proof.  The GVE Loans were received by Walter from his mother.  Neither gifts nor loans constitute items of gross income.  Sec. 102(a) (gross income does not include gifts); e.g., Ettig v. Commissioner, T.C. Memo. 1988-182 (bank deposits in question were, in fact, loan proceeds received from taxpayer's mother and, thus, not items of gross income).  Except to the extent that there is a reason to believe to the contrary, we believe that the transfers from Walter's mother into Walter's bank accounts were either gifts or loans.  We have found to the contrary to the extent that respondent has convinced us that Walter received fees for management services.[2]  Except to that extent, Walter has carried his burden of proof that the GVE Loans do not constitute items of gross income to him.

4.  Triad Distribution

FINDINGS OF FACT

In 1982, a bank check in the amount of $1,000 drawn on Triad Distribution Co. was deposited by Gertrude into Conn. account 7044.  The amount shown on Exhibit 201-GK in the row labeled "Triad Distribution" reflects that deposit (the Triad deposit).

---

[2]    We recognize that respondent maintains that the management fees in question constitute fees received from Gertrude, Walter, and Keith Martin.  Walter has not shown what portion is allocable to Gertrude and, because of the relative smallness of the amounts involved, we have not estimated.  But cf. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

OPINION

On brief, respondent states:  "But for its alleged corporate origin, this deposit is indistinguishable from the deposits classified as 'GVE Loans.'"  We agree.  The Triad deposit does not constitute an item of gross income to Walter.

5.  <u>WFVE Gifts and Loans</u>

FINDINGS OF FACT

The $2,000 amount shown on Exhibit 201-GK in the row labeled "WFVE Gifts" reflects a deposit into Conn. account 7044 in 1982 of $2,000 received from William, Walter's father.

On September 16, 1986, a checking account in the name of W. Van Eck was opened in Oregon, at Oregon Bank, account number 18129148 (OB account 9148).  W. Van Eck stands for William Van Eck.  OB account 9148 served as Walter's personal account from the time it was opened until at least the time of trial.  The $100 amount shown on Exhibit 201-GK in the row labeled "WFVE Gifts" reflects a deposit into OB account 9148 in 1986 of $100 received from William.

The $6,000 amount shown on Exhibit 201-GK in the row labeled "WFVE Loans" reflects a deposit into Conn. account 7044 in 1983 of $6,000 received from William.

On September 15, 1986, a checking account in the name of William F. Van Eck was opened in Oregon, at First Interstate Bank, account number 564 0 05127 6 (FIB account 1276).  Walter made all of the deposits to FIB 1276 during 1986 and 1987.

Walter signed all of the checks drawn on FIB 1276 during 1986 and 1987. On March 9, 1987, a check in the amount of $10,000 drawn on an account of William's at First Bank of New Haven was deposited to FIB account 1276. On March 19, 1987, a check drawn on FIB account 1276 to Walter Van Eck was deposited to an account of Friedgard's at U.S. National Bank. The $10,000 amount shown on Exhibit 201-GK in the row labeled "WFVE Loans" reflects the deposit into FIB account 1276, on March 9, 1987, of the $10,000 check drawn on William's account at First Bank of New Haven.

OPINION

The amounts shown on Exhibit 201-GK as WFVE Loans and WFVE Gifts (the WFVE Loans and Gifts) represent deposits to bank accounts under the control of Walter: in essence, Walter's accounts. Respondent's arguments with respect to the WFVE Loans and Gifts are precisely the same as with respect to the GVE Loans, and our response is precisely the same. The WFVE Loans and Gifts do not constitute items of gross income to Walter.

6. Reprographics Plastics Deposits

FINDINGS OF FACT

On October 30, 1985, a checking account in the name of Reprographics Plastics Corporation (Reprographics) was opened in Oregon, at U.S. Bank, account number 155-0010-894 (USB account 0894). Walter prepared and signed all checks, made all of the deposits, and maintained all of the bank records for USB account

0894.  During 1985, 1986, and 1987, payments were made from USB account 0894 for the benefit of Walter and Friedgard.

Reprographics was a Canadian corporation during the years at issue.  Jan, Walter's brother, was president of Reprographics. Reprographics has never been registered as an entity authorized to do business in the State of Oregon.

The amounts shown on Exhibit 201-GK in the row labeled "Reprographics Plastics" reflect certain deposits to USB 0894. The amounts remaining in dispute as Reprographics Plastics' deposits (the Reprographics Plastics's deposits) are as follows[3]:

| Year | Amount |
|------|--------|
| 1985 | $1,200.00 |
| 1986 | 8,333.80 |
| 1987 | 35,000.00 |

The Reprographics Plastics' deposits were deposited to USB account 0894 during the years indicated.  All of the Reprographics Plastics' deposits constitute items of gross income to Walter.

OPINION

Respondent's theory is that the Reprographics Plastics' deposits were expended for the benefit of Walter and Friedgard

---

[3]    Except with regard to 1987, our findings agree with entries for 1985 through 1987 in the row labeled "Reprographics Plastics" on Exhibit 201-GK.  The discrepancy arises because of respondent's concession on brief that "$7,500 of the $42,000 total 1987 disputed Repro deposits should be eliminated as a gross income item."  We accept that concession.

and, thus, constitute items of gross income to them. Walter and Friedgard contest that the Reprographics Plastics' deposits were expended for their benefit and, indeed, contest that such funds were available to them at all: "Walter Van Eck had only trust authority over the Reprographics Plastics monies. Not only did he not use any of it for personal purposes, none of it was available to him for such purposes."

Petitioners have not convinced us that Walter only had "trust authority" with regard to USB account 0894. Clearly, he had control over the account, in the sense that he made all deposits to the account, wrote all checks, and kept the records with regard to the account. In testimony, Walter answered yes to the question of whether he managed the account. We have no adequate reason to believe that Walter's authority with respect to USB account 0894 was restricted in any way. He has shown us nothing establishing him as a fiduciary with respect to USB account 0894. Walter failed to produce his brother, Jan, to corroborate that Walter's authority was limited in any way. We may infer by Walter's failure to call Jan that Jan's testimony would not have been favorable to Walter. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986) (quoting Blum v. Commissioner, 59 T.C. 436, 440-441 (1972); "the fact that petitioner did not offer any corroborative testimony * * * or offer any explanation for not so doing weighs against him."); see also Quita v. Commissioner, T.C. Memo. 1988-309 (taxpayers'

failure to offer corroborative testimony that they held funds as nominees is a significant factor in determining that they failed to carry their burden of proof). We conclude that USB account 0894 was Walter's account, maintained in the name of Reprographics.

Walter testified that Reprographics conducted no business in the United States except that it purchased certain second mortgages. Checks written on USB account 0894 from November 1985 through December 1987 are in evidence. Some of those checks clearly fail to relate to the purchase of second mortgages. For example, USB account 0894 check numbers 6902 and 6907, in the amounts of $1,200 and $2,000, respectively, were issued in December 1985, and drawn to "Northwest Dance Center". On brief, with no citation to the record, petitioners explain those checks as loans, apparently unsecured, "to help a struggling arts group". USB account 0894 check number 6979, in the amount of $1,500, was issued in October 1986, and drawn to "Walter J. Van Eck". On brief, petitioners claim, with the citation of nothing other than the letters "ln" on the check, that such check represented a loan to Walter (subsequently repaid). As to numerous checks that, on brief, petitioners concede were mortgage payments on properties owned by them, petitioners argue that such checks were payments on the "Universal Finance second mortgage" that Reprographics "was purchasing on contract (see the

discussion at proposed finding #XIX)." Petitioners have made no such proposed finding.

We have found that the Reprographics Plastics' deposits were deposited to USB account 0894. We are convinced that Walter had control and authority over USB account 0984 that amounted to ownership of that account. As we have stated, bank deposits are prima facie evidence of income. Tokarski v. Commissioner, supra at 76. Petitioners have failed to rebut the prima facie evidence that the Reprographics Plastics' deposits were gross income to Walter. Moreover, petitioners deny that, during 1985, 1986, and 1987, payments were made from USB account 0894 for the benefit of one or the other (or both) of them. We have found to the contrary. Thus, even if we assume that Walter was not the owner of USB account 0894, petitioners have failed to prove that some, or all, of the expenditures made from that account were not gross income to one or the other of them. We sustain respondent's determinations of deficiencies to the extent based on the Reprographics Plastics' Deposits.

7. Unknown Source Deposits

a. 1982

FINDINGS OF FACT

During at least the first 5 months of 1982, Walter and Kosydar (his then wife) maintained a joint checking account in Oregon, at U.S. Bank, account number 155-0501-348 (USB account

1348). Among other deposits, rents for properties jointly owned by Walter and Kosydar were deposited to that account. During 1982 through 1984, there existed in Oregon a checking account in the names of William F. and Walter J. Van Eck, at First Interstate Bank, account number 564 0 02579 8 (FIB account 5798). Walter made all the deposits to and signed all checks drawn on that account. The amount shown on Exhibit 201-GK in the row labeled "Unknown", for 1982, reflects certain deposits to USB 1348 and FIB 5798 during 1982.[4] The amount remaining in dispute as unknown deposits for 1982 (1982 Unknown Deposits) is $34,752.[5] Of that amount, all but $500 was deposited to USB account 1348; $500 was deposited to FIB account 5798.

The 1982 Unknown Deposits constitute commission, interest, and rental income to Walter in the amount of $13,636. Additionally, the 1982 Unknown Deposits constitute gross income to Walter in the amount of $8,000. In total, the 1982 Unknown Deposits constitute gross income to Walter in the amount of $21,636.

---

[4] And a $7.05 deposit to another account, which we have disregarded because of its small size.

[5] I.e., the $52,848.48 shown on Exhibit 201-GK in the row labeled "Unknown", for 1982, less the amounts conceded by respondent in the Second Supplemental Stipulation of Facts, pars. 4 and 5, $9,385 and $8,704, respectively, not to be unknown deposits, and the $7.05 described in the immediately preceding footnote.

OPINION

Respondent proposes that we find as a fact that the 1982 Unknown Deposits "are rents and land sale contract proceeds". Petitioners have objected specifically to respondent's proposal in a way that has aided us in making our finding as to amount of 1982 Unknown Deposits that constitute gross income to Walter.

Petitioners concede that $1,142.75 of the 1982 Unknown Deposits represents a commission check that is gross income to Walter. Petitioners concede that the 1982 Unknown Deposits represent rent and interest with respect to real property sales (RP10142 and RP19547) in the amounts of $784 and $1,240 (total $2,024) and that one-half, $1,012, is taxable to Walter (the other half being taxable to Kosydar). Petitioners concede that the 1982 Unknown Deposits represent rental income in the amount of $22,961, one-half of which, $11,481, is taxable to Walter (the other half being taxable to Kosydar). We accept petitioners' concessions, and, based thereon, have found that the 1982 Unknown Deposits constitute commission, interest, and rental income to Walter in the amount of $13,636.[6]

---

[6]     On brief, petitioners challenge respondent's concession in the Second Supplemental Stipulation of Facts, pars. 4 and 5, that the interest income there described, in the amounts of $9,385 and $8,704, should reduce the amount shown on Exhibit 201-GK for 1982 as unknown deposits. This challenge would seem to be against petitioners' interest. Since we have not found total gross income from unknown deposits for 1982 in excess of 1982 Unknown Deposits, we feel no pressure to resolve the conflict in the parties' positions, and we do not.

Petitioners argue that $16,941 of the 1982 Unknown Deposits represents loan proceeds, which, for that reason, are not taxable. As to $15,000 of that amount, deposited to USB account 1348, petitioners proffer entries on two stipulated exhibits, Exhibits 170-FN and 171-FO, both rental property listings, prepared by Walter in December 1982 and in September 1983, respectively, which show nothing more than certain estimated mortgage balances. Petitioners offer nothing from the record showing that $15,000 in loan proceeds constitutes part of the 1982 Unknown Deposits. As to the remaining $1,941, petitioners have satisfied us that such amount does constitute the proceeds of loans. The $15,000 item is a deposit to USB account 1348 that petitioners have failed adequately to explain. Because USB account 1348 was a joint account held by Walter with Kosydar, we believe that only one-half of that amount ($7,500) constitutes an item of gross income to Walter. Cf. Tokarski v. Commissioner, 87 T.C. 74 (1986). We have found accordingly.

Finally, petitioners argue that $500 for the 1982 Unknown Deposits were deposited into an account of William Van Eck's and, therefore, cannot be taxable to Walter. The account in question, FIB account 5798, is in the name of William and Walter. We have found that Walter made all the deposits and signed all checks drawn on that account. William was not called to testify to Walter's lack of authority over the account. From William's

failure to testify, we can draw a negative conclusion.  See Tokarski v. Commissioner, supra at 77.  We believe that Walter had control, and thus ownership, of FIB account 5798.  As we have stated, bank deposits are prima facie evidence of income. Tokarski v. Commissioner, supra at 76.  Accordingly, the $500 deposit to FIB 5798 constitutes an item of gross income to Walter.

We sustain that part of respondent's determination of a deficiency for 1982 that is based on the 1982 Unknown Deposits to the extent we have found that the 1982 Unknown Deposits constitute gross income to Walter.

b.  1983

FINDINGS OF FACT

During 1983 and 1984, there existed in Oregon a checking account in the names of Gertrude J. Vermande (Walter's mother) and Walter J. Van Eck, at First Interstate Bank, account number 564 0 03155 0 (FIB account 1550).  Walter made all the deposits to and signed all checks drawn on that account.

Respondent originally classified certain deposits to FIB account 1550 and to two additional accounts, FIB account 5798 (discussed supra paragraph 7.a.) and USB account 2221 (discussed supra paragraph 3), as being deposits of unknown origin (the Original 1983 Unknown Deposits).  The Original 1983 Unknown Deposits are as follows:

| Account | Amount |
|---------|--------|
| FIB 1550 | $6,494 |
| FIB 5798 | 1,450 |
| USB 2221 | 1,180 |
| Total | $9,124 |

The amount shown on Exhibit 201-GK for 1983 in the row labeled "Unknown" ($658.44) reflects that portion of the Original 1983 Unknown Deposits still in dispute as unknown deposits for 1983 (1983 Unknown Deposits). The 1983 Unknown Deposits constitute an item of gross income to Walter.


OPINION

The 1983 Unknown Deposits are less than the Original 1983 Unknown Deposits because Walter has conceded that $8,466 of the Original 1983 Unknown Deposits constitutes an item of gross income to him for 1983, and respondent has conceded that the amount conceded by Walter no longer is a deposit of unknown origin for 1983. We accept those concessions and so find. However, the parties have not told us out of which accounts the conceded amount is deemed to have come. That, however, is of no consequence because we conclude that Walter owned the three accounts in question. We have found that Walter made all the deposits to and signed all checks drawn on FIB account 1550. We have found similarly with regard to FIB account 5798 (supra paragraph 7(a)). We also have found that USB account 2221 was an account maintained by Walter in his own name (supra paragraph 3).

Clearly, he had control and authority with regard to USB account 2221, which was in his own name. We have determined that he had control and authority over FIB account 5798 (supra paragraph 7(a)). In the case of FIB account 1550, which was in the names of Walter and Gertrude, he had control, and Gertrude was not called to testify to his lack of authority. From her failure to testify, we can draw a negative conclusion. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986), Quita v. Commissioner, T.C. Memo. 1988-309. We conclude that Walter had the authority to use the funds in that account as he saw fit. We are convinced that Walter had control and authority over all three accounts that amounted to ownership of the accounts. Walter has failed to carry his burden of proving that the 1983 Unknown Deposits do not constitute an unreported item of gross income for 1983. Tokarski v. Commissioner, supra. We have found accordingly. We sustain that part of respondent's determination of a deficiency for 1983 that is based on the 1983 Unknown Deposits.

c. 1984

### FINDINGS OF FACT

During portions of 1984 and 1985, Friedgard maintained a checking account in Oregon, in her own name, at First Interstate Bank, account number 104-0-03005-8 (FIB account 0058). FIB account 0058 was Friedgard's personal account.

Respondent originally classified certain deposits to FIB account 0058 and to two additional accounts, FIB account 1550 (discussed paragraph 7.b., supra) and USB account 2221 (discussed paragraph 3, supra), as being deposits of unknown origin (the Original 1984 Unknown Deposits). The Original 1984 Unknown Deposits are as follows:

| Account | Amount |
|---------|--------|
| FIB 0058 | $668 |
| FIB 1550 | 7,738 |
| USB 2221 | 1,100 |
| Total | $9,506 |

The amount shown on Exhibit 201-GK for 1984 in the row labeled "Unknown" ($4,588.25) reflects that portion of the Original 1984 Unknown Deposits still in dispute as unknown deposits for 1984 (1984 Unknown Deposits). Of the 1984 Unknown Deposits, $4,589 constitutes an item of gross income to Walter.

OPINION

The 1984 Unknown Deposits are less than the Original 1984 Unknown Deposits because Walter has conceded that $4,917 of the Original 1984 Unknown Deposits constitutes an item of gross income to him for 1984, and respondent has conceded that the amount conceded by Walter no longer is a deposit of unknown origin for 1984. We accept those concessions and so find. However, the parties have not told us out of which accounts the conceded amount is deemed to have come. We conclude, as we did for 1983, that Walter had control and authority over FIB account

1550 and USB account 2221 that amounted to ownership of those accounts. We do not, however, conclude that he had any control and authority over FIB account 0058, Friedgard's personal account.

Walter has the burden of proving the extent to which the $4,917 that he conceded is an item of gross income reduces the Original 1984 Unknown Deposits to FIB account 1550 and USB account 2221. Walter has failed to prove any such reduction. Thus, we find that the such conceded amount ($4,917) reduces the Original 1984 Unknown Deposits to FIB account 0058 to the extent thereof, $668, and only the remainder, $4,249 ($4,249 = $4,917 - $668), reduces the Original 1984 Unknown Deposits to FIB account 1550 and USB account 2221. The Original 1984 Unknown Deposits to those two accounts totaled $8,838 ($8,838 = $7,738 + $1,100). After taking into account the conceded amount allocated thereto, the 1984 Unknown Deposits remaining in those accounts is $4,589 ($4,589 = $8,838 - $4,249). We conclude that, with respect to such deposits ($4,589), Walter has failed to carry his burden of proving that these deposits do not constitute an unreported item of gross income for 1984. Tokarski v. Commissioner, supra. We have found accordingly. We sustain that part of respondent's determination of a deficiency for 1984 that is based on the 1984 Unknown Deposits to the extent we have found that the 1984 Unknown Deposits constitute gross income to Walter.

d.  1985

FINDINGS OF FACT

From March 1985 through at least 1986, a checking account was maintained in Oregon, in Friedgard's name, at First Interstate Bank, account number 564-0-04092 4 (FIB account 0924). A portion of the funds deposited to FIB account 0924 were transferred from FIB account 0058 (discussed in paragraph 7.b., supra).  During a portion of 1985, Walter maintained a checking account in Oregon, at U.S. Bank, account number 155-0501-843 (USB account 1843).

Respondent originally classified certain deposits to FIB account 0924, USB account 1843, and FIB account 0058, as being deposits of unknown origin (the Original 1985 Unknown Deposits). The Original 1985 Unknown Deposits are as follows:

| Account | Amount |
|---------|--------|
| FIB 0924 | $370 |
| USB 1843 | 350 |
| FIB 0058 | 2,113 |
| Total | $2,833 |

The amount shown on Exhibit 201-GK for 1985 in the row labeled "Unknown" ($808.75) reflects that portion of the Original 1985 Unknown Deposits still in dispute as unknown deposits for 1985 (1985 Unknown Deposits).  Of the 1985 Unknown Deposits, $350 constitutes an item of gross income to Walter.

OPINION

The 1985 Unknown Deposits are less than the Original 1985 Unknown Deposits because Walter has conceded that $2,024 of the

Original 1985 Deposits constitutes an item of gross income to him for 1985, and respondent has conceded that the amount conceded by Walter no longer is a deposit of unknown origin for 1985. We accept those concessions and so find. However, the parties have not told us out of which accounts the conceded amount is deemed to have come. We conclude that Walter had control and authority over USB account 1843 that amounted to ownership of that account. We do not, however, conclude that he had any control and authority over FIB accounts 0058 and 0924, the accounts in Friedgard's name. As was true for 1984, Walter has the burden of proving the extent to which the $2,024 that he conceded is an item of gross income reduces the Original 1985 Unknown Deposits to USB account 1843. Walter has failed to prove any such reduction. Thus, we find that the such conceded amount ($2,024) reduces the Original 1985 Unknown Deposits to FIB accounts 0058 and 0924 to the extent thereof, $2,483 ($2,483 = $370 + 2,113), and, since nothing remains, nothing reduces the Original 1985 Unknown Deposits to USB account 1843. Accordingly, the full $350 of Original 1985 Unknown Deposits to USB account 1843 remains as 1985 Unknown Deposits to that account. We conclude that, with respect to such deposits ($350), Walter has failed to carry his burden of proving that these deposits do not constitute an unreported item of gross income for 1985. Tokarski v. Commissioner, 87 T.C. 74 (1986). We sustain that part of respondent's determination of a deficiency for 1985 that is based

on the 1985 Unknown Deposits to the extent we have found that the 1985 Unknown Deposits constitute gross income to Walter.

e. 1986

FINDINGS OF FACT

From March 1985 through 1987, there existed in Oregon a checking account in the names of Gertrude J. Vermande, Walter's mother, at First Interstate Bank, account number 564 0 04005 3 (FIB account 0053). Walter made all the deposits to, and signed all checks drawn on, that account. FIB account 0053 was opened to replace FIB account 1550 (discussed in paragraph 7.b., supra). During portions of 1986 and 1987, there existed in Oregon a savings account in the name of R. Hodges, Friedgard's mother, at Oregon Bank, account number 18134604 (OB account 4604).

Respondent originally classified certain deposits to FIB account 0053 and OB account 4604 (and a deposit of $18.25 to another account, which we will disregard because of its small size) as being deposits of unknown origin (the Original 1986 Unknown Deposits). The Original 1986 Unknown Deposits are as follows:

| Account | Amount |
|---------|--------|
| FIB 0053 | $857 |
| OB 4604 | 835 |
| Total | $1,692 |

The amount shown on Exhibit 201-GK for 1986 in the row labeled "Unknown" ($1,544, after subtracting the $18.25 we have disregarded) reflects that portion of the Original 1986 Unknown Deposits still in dispute as unknown deposits for 1986 (1986

Unknown Deposits).  Of the 1986 Unknown Deposits, $857 constitutes an item of gross income to Walter.

OPINION

The 1986 Unknown Deposits are less than the Original 1986 Unknown Deposits because Walter has conceded that $147.79 of the Original 1986 Unknown Deposits constitutes an item of gross income to him for 1986, and respondent has conceded that the amount conceded by Walter no longer is a deposit of unknown origin for 1986.  We accept those concessions and so find.  However, the parties have not told us out of which accounts the conceded amount is deemed to have come.  We conclude that Walter had control and authority over FIB account 0053, as we did for the predecessor account, FIB account 1550 (see discussion <u>supra</u> paragraph 7.b.).  We do not, however, conclude that he had any control and authority over OB account 4604, the Hodges account.  As was true for 1984 and 1985, Walter has the burden of proving the extent to which the $147.79 that he conceded is an item of gross income reduces the Original 1986 Unknown Deposits to FIB account 0053.  Walter has failed to prove any such reduction.  Thus, we find that the such conceded amount ($147.79) reduces the Original 1986 Unknown Deposits to OB account 4604 to the extent thereof, $835, and, since nothing remains, nothing reduces the Original 1986 Unknown Deposits to FIB account 0053.  Accordingly, the full $857 of Original 1986 Unknown Deposits to FIB account 0053 remains as 1986 Unknown Deposits to that account.  We

conclude that, with respect to such deposits ($857), Walter has failed to carry his burden of proving that such deposits do not constitute an unreported item of gross income for 1986. Tokarski v. Commissioner, supra. We have found accordingly. We sustain that part of respondent's determination of a deficiency for 1986 that is based on the 1986 Unknown Deposits to the extent we have found that the 1986 Unknown Deposits constitute gross income to Walter.

f. 1987

### FINDINGS OF FACT

During 1987, a checking account was maintained in Oregon, at First Interstate Bank, in the name of R. Hodges, account number 564 0 01353 6 (FIB account 3536). Funds in that account were owned by Friedgard, and the account was used by her for personal purposes. During 1987, a checking account was maintained in Oregon, at Oregon Bank, in the name of R. Hodges, account number 18128730 (OB account 8730). Funds in that account were owned one-half by Walter and one-half by Friedgard, and the account was used by them for personal purposes. During 1987, a checking account was maintained in Oregon, at U.S. Bank, in the name of Friedgard V.B. Van Eck, account number 155-0812-109 (USB account 2109). USB 2109 was used by Walter as a business checking account. During a portion of 1987, a checking account was maintained in Oregon, at U.S. Bank, in the name of William F. Van Eck, account number 155-0045-155 (USB account 5155). During

1987, Walter made all deposits to and signed all checks on USB 5155.

Respondent originally classified certain deposits to the accounts set forth in the immediately preceding paragraph and to four additional accounts, FIB account 0053 (discussed supra paragraph 7.e.), OB account 9148 (discussed supra paragraph 5), OB account 4604 (discussed supra paragraph 7(e)) and an account identified only as "FIB-4941", as being deposits of unknown origin (the Original 1987 Unknown Deposits).  The Original 1987 Unknown Deposits are as set forth in Exhibit 106-DB.

The amount shown on Exhibit 201-GK for 1987 in the row labeled "Unknown" ($4,746.84) is the same as the 1987 Original Unknown Deposits and reflects that all of the Original 1987 Unknown Deposits are still in dispute as unknown deposits for 1987 (1987 Unknown Deposits).  Of the 1987 Unknown Deposits, $4,497 constitutes an item of gross income to either Walter or Friedgard.

                              OPINION

Except with regard to OB account 4604 and the account that respondent has identified only as FIB-4941, we conclude that Walter had control and authority over all of the accounts listed under the heading "Unknown" on Exhibit 106-DB.  We do not, however, conclude that he had any control and authority over FIB-4941 or OB account 4604.  Thus except with regard to the deposit to OB 4604 of $160 and the deposit to FIB-4941 of $89.81,

petitioners have failed to carry their burden of proving that the 1987 Unknown Deposits do not constitute an unreported item of gross income for 1987. <u>Tokarski v. Commissioner</u>, 87 T.C. 74 (1986). We have found accordingly. We sustain that part of respondent's determination of a deficiency for 1987 that is based on the 1987 Unknown Deposits to the extent we have found that the 1987 Unknown Deposits constitute gross income to Walter.

8. <u>Nondeposited Amounts</u>

FINDINGS OF FACT

During the years indicated, Walter received the following amounts of rental income, which he did not deposit to any bank account:

| Year | Amount |
|------|--------|
| 1982 | $359.00 |
| 1983 | 1,485.43 |
| 1984 | 552.00 |

OPINION

On Exhibit 201-GK, under the heading "Additional Income", in columns headed 1982 through 1985, are certain amounts that respondent claims are income items that Walter received but did not deposit in any bank account and failed to report as income. Most of those amounts are labeled as rent. Three items (two for 1982 and one for 1985) are not labeled as rent. Respondent supports her inclusion in gross income of the items under the heading of "Additional Income" with the following proposed finding of fact:

Walter Van Eck did not always deposit rents he collected into the Bank Accounts. The amounts of rent he did not deposit into any of the 24 Bank Accounts during the years 1982 through 1986 [1985] years [sic] were at least $1,164, $1,485.43, $552, and $3,000, respectively.

Respondent's citations to the record in support of that finding do not support any particular amounts of undeposited and unreported rents for 1982 through 1985. Additional findings proposed by respondent do support respondent's conclusion that Walter did fail to deposit and report some rent for each of 1982 through 1985.

Petitioners object to respondent's proposed finding set out above as follows:

Walter Van Eck deposited all rents received, even cash rents (Tr. XIX). Very occasionally, he used some of the cash before making the deposit, in which case he replaced the cash with new cash, obtained by writing a check to "Cash," so that the full rent deposit could be made. (TR. XIX).

We cannot identify the indicated pages of the transcript and conclude that petitioners have failed to rebut the conclusion to be drawn from respondent's proposed finding that Walter failed to deposit and report some rents. Petitioners have raised our suspicion that not all of the amounts labeled as "Additional Income" are rental income. The $3,000 amount shown for 1985 as "19556 Payment" appears to be a payment with regard to a property transaction that respondent concedes is not a taxable amount. See Supplemental Stipulation of Facts paragraph 21 and Second Supplemental Stipulation of Facts paragraph 33. Accordingly, we

have found as rent items constituting gross income only those amounts labeled as "Rental Income". We sustain respondent's determinations of deficiencies for 1982 through 1985 that are based on the "Additional Income" set forth on Exhibit 201-GK only to that extent.

Deductions

### 1987 Schedule E Loss

On Schedule E attached to petitioners' 1987 U.S. Individual Income Tax Return, petitioners claimed a loss from rental property (identified as "office 10245 Wilsonville, Wilson") of $1,936.02. Respondent disallowed that loss on the ground, among others, that petitioners had not established that the property was anything other than their personal residence. On brief, in objection to respondent's proposed finding of fact that petitioners claimed Walter's office in petitioners' home as a rental property, petitioners argue that the loss in question represents management expenses attributable to rental properties, but not directly attributable to a specific rental property. Petitioners have failed to carry their burden of proving that they incurred the expenses in question or that, indeed, they related to any rental properties owned by one or the other (or both) of them. Respondent's disallowance is sustained.

Other Rental Deductions

Respondent has proposed as a finding of fact that petitioners are entitled to deductions for rental property expenses and mileage in the following aggregated amounts:

| Year | Amount |
|------|--------|
| 1982 | $7,528.00 |
| 1983 | 2,072.92 |
| 1984 | 2,234.76 |
| 1985 | 4,887.57 |
| 1986 | 562.15 |
| 1987 | 7,256.86 |

We find accordingly. Petitioners have failed to prove that they incurred any additional rental property expenses or mileage. No further deduction for rental property expenses or mileage is allowed.

Additions to Tax

1. Failure to File

Respondent determined section 6651(a)(1) additions to tax against Walter for his 1982 through 1986 taxable years. Section 6651(a)(1) provides that, in the case of a failure to file an income tax return by the due date, there shall be imposed an addition to tax for such failure of 5 percent of the amount of tax, reduced by timely payments and credits under section 6651(b)(1), for each month or portion thereof during which the failure continues, not exceeding 25 percent in the aggregate, unless such failure is due to reasonable cause and not due to willful neglect.

Petitioners have failed to prove either that Walter timely filed income tax returns for the years in question or that his failure was due to reasonable cause and not due to willful neglect.  At trial, Walter testified that, on account of proceedings with respect to his divorce from Kosydar, documents necessary for him to file his returns were presented as exhibits and kept as exhibits by "the court" until 1986.  Walter did not detail the records that were submitted to a court nor show that he took any steps to consult those records in order to prepare his returns.  He did not show that the records submitted were indispensable for him to file his returns.  He did not show the dates on which particular documents were submitted in relation to the due dates for his returns.  He did not show that he lacked duplicates of any indispensable documents, nor did he show that he took reasonable steps to obtain or reconstruct indispensable data from other sources.  Respondent's additions to tax under section 6651(a)(1) are sustained.

2.  <u>Negligence</u>

Section 6653(a) imposes one or more additions to tax where an underpayment of tax is due to negligence or intentional disregard of rules or regulations (hereafter, without distinction, negligence).  Respondent has determined additions to tax for negligence with respect to all years.  Section 6653(a)(1), for returns due in 1989, section 6653(a)(1)(A), for returns due in 1987 and 1988, and section 6653(a)(1), for returns

due in 1982 through 1986, impose an addition to tax equal to 5 percent of the entire underpayment if any portion of such underpayment is due to negligence.  Section 6653(a)(1)(B), for returns due in 1987 and 1988, and section 6653(a)(2) for returns due in 1982 through 1986, impose an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence. "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part, revg. in part 43 T.C. 168 (1964)).

Walter's 1982 through 1986 returns were not timely filed. Inasmuch as there were no timely filed returns for those years, the amounts shown on timely filed returns are zero, and the underpayments equal the entire tax liability.  Emmons v. Commissioner, 92 T.C. 342, 348-349 (1989), affd. 898 F.2d 50 (5th Cir. 1990).  Where, as here, an underpayment is caused by the taxpayer's failure to timely file an income tax return, such underpayment is due to negligence if the taxpayer lacks reasonable cause for such failure.  See id. at 349.  As discussed in connection with section 6651(a)(1), Walter has not shown reasonable cause for his failure to timely file his 1982 through 1986 returns, and, therefore, we have found lack thereof.

Accordingly, the entire underpayments for the years 1982 through 1986 are due to negligence, and we sustain respondent's additions to tax under section 6653(a) for such years.

Petitioners have made no specific argument with regard to the additions to tax for negligence for 1987 and 1988. Petitioners have failed to carry their burden of proving that they were not negligent. Accordingly, the entire underpayments for the years 1987 and 1988 are due to negligence, and we sustain respondent's additions to tax under section 6653(a) for such years.

<u>Decision will be entered under Rule 155</u>.

APPENDIX

WALTER VAN ECK
DISPUTED DEPOSITS/ITEMS OF INCOME

| | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|
| RENTAL INCOME: | | | | | | |
| 226 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,485.00 |
| 462-463 | 2,598.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1024 | 1,864.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1217 | 2,574.70 | 0.00 | 0.00 | 0.00 | 0.00 | 404.12 |
| 1517 | 3,888.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1685 | 0.00 | 0.00 | 2,380.00 | 0.00 | 0.00 | 300.00 |
| 1815 | 2,832.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2815 | 2,628.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3634 | 1,932.00 | 0.00 | 0.00 | 0.00 | 690.00 | 1,285.00 |
| 3640 | 2,974.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3641 | 1,585.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3647 | 1,750.00 | 0.00 | 0.00 | 0.00 | 1,291.00 | 4,543.12 |
| 3652 | 3,208.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4803 | 1,565.00 | 0.00 | 0.00 | 0.00 | 1,050.00 | 4,204.78 |
| 4807 | 750.00 | 0.00 | 0.00 | 0.00 | 175.00 | 1,400.00 |
| 5031 | 3,705.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5825 | 2,192.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19547 | 2,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19567 | 0.00 | 0.00 | 2,972.00 | 0.00 | 0.00 | 0.00 |
| MISC RENTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL RENT INCOME | $38,546.71 | $0.00 | $5,352.00 | $0.00 | $3,206.00 | $15,622.02 |
| WVE WAGES FROM PRRS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MANAGEMENT/SET UP FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST EARNED--LOANS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10142 CONTRACT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 16074 CONTRACT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19547 CONTRACT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19556 CONTRACT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MFC SALES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TRIAD DISTRIBUTION | 1,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3203 PAYMENTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| REPROGRAPHICS PLASTICS | 0.00 | 0.00 | 0.00 | 1,200.00 | 8,333.80 | 42,500.00 |
| UNKNOWN | 52,848.48 | 658.44 | 4,588.25 | 808.75 | 1,562.25 | 4,746.84 |
| GVE LOANS | 32,564.84 | 23,741.95 | 48,008.70 | 49,389.93 | 39,872.48 | 38,965.80 |
| WFVE GIFTS | 2,000.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 |
| WFVE LOANS | 0.00 | 6,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| TOTALS | $126,960.03 | $30,400.39 | $57,948.95 | $51,398.68 | $53,074.53 | $111,834.66 |

ADDITIONAL INCOME:

| | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|
| 5825 RENTS, PER WVE NOTES | $50.00 | | | | | |
| 5825 RENTS, PER WVE NOTES | 309.00 | | | | | |
| 10142 CONTRACT, PER CK REG. | 560.00 | | | | | |
|   USB-1843, 9/29/83 | | | | | | |
| UNKNOWN SOURCE | 245.00 | | | | | |
|   USB-1843, 10/19/83 | | | | | | |
| 462-3 RENT FOR 5/83, | | 721.80 | | | | |
|   USB-1843, 6/22/83 | | | | | | |
| 462-3 RENT FOR 6/83, | | 763.63 | | | | |
|   USB-1843, 7/22/83 | | | | | | |
| 19567 RENTS, RECEIPT #5448 | | | $545.60 | | | |
| 19567 RENTS, RECEIPT #5449 | | | 6.40 | | | |
| 19556 PAYMENT, | | | | 3,000.00 | | |
|   USB-0894, 12/10/85 | | | | | | |
| TOTAL INCOME NOT DEPOSITED | $1,164.00 | $1,485.43 | $552.00 | $3,000.00 | $0.00 | $0.00 |
| INTEREST EARNED ON THE | | | | | | |
|   --10142 CONTRACT: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
|   --16074 CONTRACT: | 9,384.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19556 CONTRACT: | | | | | | |
|   PAYMENT BOOK #36 | 8,704.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PAYMENT BOOK #41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST EARNED, (VICKIE) | | | 0.00 | | | |
| TOTAL CONTRACT INTEREST | $18,088.99 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |